Oh, thank you, Judge Bishop. I actually was going to request five minutes for rebuttal, so I will make sure to stop at 15 minutes as best as I can. Good afternoon, your honors, and may it please the court. My name is Jay Kassner. I'm here appearing for the defendant's appellants. For the past nine years, since the Silicon Graphics decision of this court, panels such as your honors have rigorously enforced the pleading requirements of the Private Securities Litigation Reform Act by mandating that a plaintiff provide a list in great detail of all relevant circumstances that constitute strong circumstantial evidence of deliberate recklessness or conscious misconduct. Justice Ginsburg, writing for the Supreme Court in the Tell Labs decision, indicated that the strong inference must be cogent and at least as compelling as any opposing inference one could draw from the facts alleged. The question presented this afternoon to this court is whether, in the words of Justice Ginsburg last year in Tell Labs, those exacting pleading standards and the deterrent effect that the court has consistently recognized these standards are intended to serve are satisfied where the plaintiff simply rests upon the content of the statements alleged to be false and misleading and the importance of the subject matter of those statements to the company. Could you help us understand what you think Tell Labs does to Silicon Graphics and its progeny? It seems that we have a new paradigm, arguably. And so are we to the right of where the court came down? Or are we comfortably within Tell Labs? Or do we come up short somehow? Judge Fisher, the Tell Labs decision endorsed prior precedent from this court. The question presented to Justice Ginsburg, and so to answer directly your question, the precedents in our view of this court prior to the Tell Labs decision remain in full force and effect. This court has had the opportunity on two occasions to evaluate district court opinions since the Tell Labs decision came down. In both of those district court opinions, the analysis and the authority was exactly as it was prior to the time that Tell Labs was decided. Justice Ginsburg decided two core issues in the Tell Labs case. One was, is it enough to have a plausible inference on behalf of the plaintiff full stop? Or is the court required to engage in some sort of a comparison? That is the approach that this court has taken since Silicon Graphics. Number two, the court was asked to decide, are they reasonable inferences, and do we take a holistic view of the complaint? In concluding that the Seventh Circuit had erred in the way it applied the pleading standards, the Supreme Court explicitly cited this court's decision in Gomper for the proposition that the court needs to take a holistic view of the pleading. So Judge Fisher, while much ink has been spilled among commentators trying to figure out, did the Supreme Court decision change the landscape or not, this court's jurisprudence from Silicon Graphics through Vantive, through Lipton, and through the other rewrite, of course, which we believe is controlling of the issue before this court, are all consistent with the way Justice Ginsburg formulated the issue before the court. Could you address what Tell Labs said about making a comparison with the reasonable inference that could be raised by the other side? When I look at the Seventh Circuit case on remand of Tell Labs, it seemed to say that on the sort of evidence that we have here, you could raise a strong inference of why there being a very weak inference, that there was no fraudulent activity. Yes, Judge Ikuda. With all due respect to the panel of the Seventh Circuit, we believe that, at the outset, that decision on remand is totally irreconcilable with this court's decision in Vantive and in ReadWrite, for the reasons that I'll get to in a moment. To understand, though, how to deal with the Seventh Circuit remand opinion, I think it's worthwhile for the court to look at what preceded the decision of Justice Ginsburg in the Supreme Court. When the Tell Labs case was first addressed on a motion to dismiss in the district court, that motion was granted. And the opinion of the court in that case granted the motion, relying very heavily upon Ninth Circuit authority. It rejected the argument that this court had rejected in Vantive and in Lipton for the proposition that mere access by being a manager to unspecified reports is sufficient. The district court in Tell Labs cited Ninth Circuit authority for the proposition that merely being a, quote, hands-on manager was enough. When that decision went up to the Seventh Circuit Court of Appeals for the first time, the court there accepted an argument that it was reasonable to infer that the chief executive officer of Tell Labs knew allegedly adverse information because it was central to the business of Tell Labs. That exact standard was rejected by this court in the ReadWrite case. Let's assume that we may have to take another look at our jurisprudence and weigh this under the paradigm analysis of Tell Labs. Maybe it's only linguistic, and maybe it's substantive. So how would you criticize, under Tell Labs analysis, point out the flaws in Judge Kuhnhauer's opinion under that standard? Thank you, Judge Fisher. I think there are two stages that this court must need to address to answer your question. The first is, does the core operations inference constitute a fact which can then be put into a paradigm of weighing cogent and strong inferences? Remember, beginning with Silicon Graphics, up through and including today, this court has required plaintiffs to allege facts. The statute itself requires that the plaintiff allege particularized facts. Well, but the district court was just making an inference from the facts in the record. I mean, the question is whether that inference was strong enough to meet that cogent standard. And what Tell Labs tells us is, and what the Seventh Circuit did, was to compare it to the competing inference. So what is the competing inference that the officers of the company were not aware of these problems with their different programs speaking to each other? Judge Okuda, I think if you proceed to the second analysis, which is, OK, that is an inference. Now, what is another plausible inference? There is absolutely nothing in the record, nothing, nothing in the complaint, from which this court could conclude that the inference that Judge Kunawer drew is the most plausible inference. And I will tell you. These people are out there talking about the problem, giving assurances to the investing public and the investor community. They presumably are, this is critical to their operation. They've acquired these different companies. They've talked about problems they had and that they've gotten on top of them. So are we supposed to assume that people who talk to analysts and the like are just sort of there and they don't bother to check to find out whether the information given to them? I mean, in the presidential campaign, we know that they get fed lines. But they always get held accountable for mouthing them. So I'm not sure tell-abs goes in the same entire direction. But this is sort of like the Ken Lay defense. I couldn't possibly have known about this, even though I'm the head of the company. So I'm having a little trouble with the generalization. Judge Fischer, let me try to be a little bit more particular with respect to exactly what we have here, because it's very important in understanding why, when management said that we believe that we have fixed the issue, that the court appreciates what the issue is because the plaintiffs, for their own reasons, have attempted to blur those differences. In the fall of 2003, Washington Mutual, and it's in the record, it's page 431, issued a press release disclosing the fact that it's hedging for what was called pipeline risk. In other words, the risk of the interval of time between when somebody commits to borrow and that loan is closed, interest rates move during that interval. Well, there are personnel at Washington Mutual who hedge the exposure to Washington Mutual of the movements and interest rates. And they're hedged with extraordinarily complicated securities interest rate swaps that will attempt to gauge those movements. The problem that arose in the fall of 2003 is that the movement of interest rates was four standard deviations greater than what had been anticipated. And what was disclosed, and it's in the record, is yes, there were some systemic issues that and the pipeline risk that was being hedged. And what was disclosed, Judge Fischer, is that they are taking care of fixing that problem. There is nothing in the record to suggest that that problem, i.e. the pipeline hedge problem, was not fixed. In fact, throughout the class period, disclosures were made by Washington Mutual confirming that, in fact, those had been fixed. Now, Washington Mutual, it's undisputed in the record, had made many acquisitions earlier in the decade, 2000, 2001. Plaintiffs make much of a statement by the chief executive officer in July of 2004 to suggest that notwithstanding what we told you, we had not been integrating our systems throughout. Well, that's simply not the case. Again, bearing in mind, in September of 2003, we have pipeline risk. In December of 2003, it's alleged in paragraph 89, which is ER 52, seven months before that July phone call, Washington Mutual disclosed at an investor conference the fact that it had not been integrating its systems that it had acquired in 2000 and 2001. Now, may it please the court, it is critically important in weighing these competing inferences that we are talking about to appreciate the pipeline hedge was fixed. The systems integration, in other words, Washington Mutual bought 10 banks. Ideally, they would want to put all of the systems of those 10 banks onto one platform. Well, there was a boom in refinancings. They didn't get around to doing that, but they didn't hide that, Your Honors. They disclosed that fully in December of 2003, eight months before plaintiffs point to a statement in July of 2004 as an indicia of fraud, that they had not been in a position to fully integrate those systems. Washington Mutual went on to say in that same announcement, we have our work cut out for us. We currently have nine different loan origination systems. Nobody was hiding anything. The only inference that can be drawn is in September, there was a pipeline hedge issue that was fixed. In December, Washington Mutual fully disclosed that it had integration issues that were challenging and that it was going to be working on. In January of 2004, paragraph 95 of the complaint in the record page 55, Washington Mutual put out a press release, again disclosing that it had not been able to integrate the mortgage acquisitions from 2001 to 2002. That press release appears in the record at 345. In May of 2004, Mr. Killinger, the chief executive officer, made some public statements. They are referenced in paragraph 114 of the complaint, page 66 of the record. And again, Mr. Killinger candidly told the public that we have a difference between integrating information for hedging, which was the issue that arisen in the fall of 03, and integrating our systems from 10 different acquisitions, which we haven't finished integrating yet. Now, in June of 2004, Washington Mutual made an early disclosure, earlier than what was required by the federal securities laws. That disclosure is referenced in paragraphs 119 and 120 in the complaint, 68 to 70 of the record. And again, Washington Mutual disclosed that the systems conversions were still ongoing. They also mentioned at page 391 that pipeline hedging, the issue that had arisen in September of 03, was not an issue. So are you saying that there were no misleading statements made by the company? Is that the position? Well, our position is that there were no misleading statements made by the company. I recognize that the certified question from Judge Kunauer related to the requisite inferences of Sienter. And the reason, Your Honor, that I'm going through these facts is our position is not only the plausible inference, but the only inference is that these were good faith beliefs of management of Washington Mutual based on what they knew at the time. And I think that comes back to Judge Fisher's question about the jurisprudence of the circuit prior to tell-labs. Let me, if I could, pose a question to you. Assuming that we conclude that the way the district court put it in his reasoning runs into Wright, Reed, and Vantoff, and maybe Lipton, or something we said there, still under tell-labs, couldn't the core responsibilities be one factor to be considered in a total circumstances analysis? And would it be prudent, assuming we were to vacate what the district court did, to send this back for the district court to assess the issue in light of tell-labs, which, of course, was decided after Judge Kunauer ruled? Judge Gould, I think certainly this court has the discretion and the power to send this back to Judge Kunauer. In terms of whether the core operations inference should be one weight on the scale of which way to weight, our position, Your Honors, is that that is not a fact, and that the only weighing that can go on is a fact. I will acknowledge, however, that Justice Ginsburg, writing for the majority in the tell-labs case, does suggest, in her opinion, that probables and the vagueness of the allegation is something that gets taken into account in terms of making the assessment that the court discussed in that case. I'm mindful of my time, but I would like to make one other point, Judge Fisher, in terms of your question on the chronology here. It is very important, Your Honors, the plaintiffs place inordinate emphasis on the July 22 post-class period statements by Mr. Killinger. The Read-Write case has addressed what a plaintiff needs to plead in order to rely upon such post-class period statements. But it is critically important to focus on what Mr. Killinger said during those remarks, because what he said and what plaintiffs portray him as having said is different. Those appear at ER 440 and 441. He is discussing four reasons why Washington Mutual reported negative results for the second quarter of 2004. One has to do with the conditions in the marketplace. One has to do with increased costs associated from the failure to have integrated those systems. The third, Your Honors, has to do with MSR hedging. That has nothing to do with the information systems that Mr. Killinger was talking about. MSR hedging, mortgage servicing rights, is an asset at Washington Mutual. When they sell a loan, they retain the right to process mortgage payments, to send notices out. That asset has a value. That value depends upon the life of the mortgage. If interest rates go up and those loans don't get prepaid, then that asset has a larger value. If interest rates go down and a borrower does prepay, that asset's value reduces. The problem that arose, which is undisputed in the record at ER 440 and 441, is that the complicated hedges that Washington Mutual put on that asset, when the MSR value went up, the interest rates moved in an unpredicted direction and they went down. I have 39 seconds. I'd appreciate reserving. Thank you very much, Your Honors. May it please the Court, my name is Arthur Miller. I appear for the Plaintiff Appellees. In response to your question as to whether the terrain has changed post-TELADS, I think your use of the word paradigm is absolutely right. I think the opinion in TELADS simply recasts the way a court is supposed to consider the allegations relating to Scienta. Justice Ginsburg used the word holistic, take everything into account. That is obviously very contextual. That's what we said in Gompers. Yes, I have not said, nor should I be interpreted as saying, that TELADS really alters Gompers or Silicon. It simply suggests that district courts in particular now must look at everything, and weigh everything, and compare everything. Not an easy task, as Judge Posner in TELADS 2 points out, because you're comparing into a vacuum, in a sense, since all you've got are the allegations of the complaint. What it does, I think, is moot the particular question certified for appeal and review in this case. Because the question really deals with, may the court rely on what this circuit calls core operations? Not only may it rely, but under the holistic approach of Justice Ginsburg's opinion, it must rely. It may assign a large weight to it, or a small weight to it. But as Your Honor pointed out, we're talking, in this case, of the three top corporate officers who have spoken into the marketplace, not once, not twice, but many, many times, as is reflected in the appendix to Judge Kuhnhauer's opinion. They speak directly to the issue. They say, you know, trust us on this. I know what I'm talking about. That's the gist of what Killinger, Casey, and Oppenheimer are saying. We see this problem. We've got our arms around it. We've put a SWAT team on it. We've reappointed people to look at it, including Ms. Oppenheimer herself. She, in effect, along with Killinger and Casey, are taking ownership of this problem. So it's not, as learned counsel suggests, naked assertion of corporate officership, not even naked assertion of the gravity of the problem. Those are givens in this case. What you have here is affirmative conduct directed to the issue, making unqualified, unhedged, absolutely categorical statements, we've solved the problem. Well, that may be true, but we still have to find out whether they were knowingly false. Knowingly false. One has to permit some weight on the scale to the fact, A, their offices suggest knowledge, their knowledge that this is the core product. Hedging is the core product of WAMU. It's no different than what you had in TELABS, which was characterized as the flagship product. Well, I'm not sure that's correct. I mean, hedging is to account for the interest swings in their core product, which is underwriting mortgages, and they have two kinds of interest rate fluctuation. They are marketing hedging. No, but in terms of their investors, it is the hedging that protects the investor. It is no coincidence that the questioning repeatedly all those conference calls is always about the ability of WAMU to meet a rising interest rate market, followed by assurances by the speaker for the company that yes, indeed, most dramatically, on April 20, 2004, and again on May 12 and May 18 of 2004, we're talking five weeks before the great revelation that it's all messed up. They are saying, Oppenheimer is saying, Casey is saying, we are able to hedge and be ready for any of those types of environment. MSR asset effectively in any interest rate environment. Learning Council said, well, after the debacle, they say, well, our hedging program really didn't cover basis points, or we do better with narrow spreads, not wide spreads. Why isn't that here five weeks before the debacle, when throughout that period, from the fall of 2003, that interest rate is rising? This cannot be a surprise. Maybe the magnitude is a bit of a surprise, but they are telling the marketplace, as they have consistently told the marketplace, we are prepared to meet any interest rate increase. Even if Telabs underlines that, I don't think it's different from our cases, but it underlines that the district court can look at this core operations type theory, don't our cases say that's not enough to meet the pleading requirement? It's not a strong inference standing alone. But was that ruling of our cases, isn't that consistent with Telabs, or at least not as ruled by Telabs? If you make the assumption that all you have in this case is a naked allegation of core operations, not reinforced by confidential witnesses, repeated statements to the marketplace, post-class period acknowledgements. Let's just look at the core inferences, because that's what the district court was focusing on. I think it is consistent with Telabs, and possibly consistent with ReadWrite, which did not reach this point. That if all you have, if all you have is the president big problem, the Ninth Circuit can say, I'm doing a holistic analysis. I have looked at every allegation. All I see is a naked allegation of core operations that, as ReadWrite suggests, creates a reasonable inference. A reasonable inference is halfway, or 2 thirds, or 3 quarters of the way to a strong inference. It's a spectrum. That's not enough. But I suggest to you, that is not this case. That is as far as ReadWrite went. The core operations were not reinforced by particularized allegations comparable to the particularized allegations that are set out ad nauseum in this complaint. So no, there's nothing inconsistent between Telabs and ReadWrite. This case is not ReadWrite. Telabs wasn't ReadWrite. If you look at ReadWrite, ReadWrite actually took account and gave reasonable inference status to the core allegation. I say again, that moves you along. Add to that the confidential witnesses. Add to that not only the numerous statements made by the defendants directly on point, trying to reassure and convince that marketplace that everything was OK in River City. The statement that they are prepared to meet any interest, rate escalation, and elevate it to what is it that they were really promising the marketplace? Namely, we have a balanced business model. The collapse in 03 coupled with the collapse in 04 tells you instinctively they didn't have a balanced business model. Well, he says, as I understand the argument, the defendants are saying you're taking these statements out of context. You're mismatching the pipeline issue with other statements that relate to the MSR hedging. We've gone through this litany. The argument made is that even though it's, I don't know that it's in front of us, but that you haven't, if we go through the Telabs analysis and we take these statements and we match them properly to what you've alleged was going on at the time, we're going to wind up short in finding the evidence of representation to the market that they have actually asserted that they have the problem that is ultimately the cause of the ultimate downfall actually have that problem fixed. They were talking about a different issue at that point. What do we do with that? With respect, Your Honor, none of that argumentation gets you to deal with the balanced business model assertion. None of that gets you to we have effective risk management programs. None of that gets you to we are prepared and capable and have the technology to hedge. We are ready for any escalation of interest. Just take those four assertions into the marketplace by these defendants and you realize whatever the truth might be to what my learned opponent has said, it doesn't tell you anything about those four misrepresentations. Now, as to what he said, yes, there is pipeline integration and yes, there is MSR integration. There is pipeline hedging, there's MSR hedging. Only pipeline was broken, he says. Well, we learned in 04 that MSR was broken. MSR was broken. It was broken because if you take a look at the post-class period statement by Mr. Killinger on ER 441, it tells you they were still using manual procedures. It tells you they were still using multiple platforms because they hadn't integrated the platforms from the numerous acquisitions in the early part of the decade. He tells you they didn't really integrate until July 4th weekend of 04. Now, I have a wagon. It has a beautiful left wheel. The right wheel, however, is broken. I put a Band-Aid on it. Am I fixed? There is no way you can do effective MSR hedging unless your pipeline information flow is accurate and current and sufficient. And as Judge Kunauer pointed out in his opinion below, that is exactly what was wrong with the pipeline flow. Because they made the decision to go after origination, it flooded them. They could not handle it. They could not get current information. They didn't know how many mortgages they had, strongly suggesting that over on the MSR side, you don't really know what to hedge. The left hand doesn't know what the right hand is doing. Yes, you can treat them as Mars and Venus, but they're related. The degree to which they are related is, of course, a fact question well beyond the scope of the stage we're at. But if you step back, look down at this, and you see the collapse in 03 on one side and the collapse in 04 on the other side, and Judge Kunauer did a wonderful job of focusing in on the deficiencies of the technology. You cannot run a modern mortgage company. You cannot possibly say we can hedge effectively. You cannot say to your investing public, we'll take care of those interest rate rises, unless, of course, Katrina comes. But I don't see that in the small print in the April 20, May 12, May 18 statements, in which they categorically say we can take anything. Professor Miller, if we think there's any problem in what Judge Kunauer did, can we apply tell laws and decide the issue? Or would it be more prudent to remand it to the district court, which didn't have the benefit of tell laws, and have the district court tell us, in light of tell laws, tell labs, what's his rationale? Does he adhere to his decision or change it? There is no question in my mind that this court, on de novo review, can say tell labs, although it may change the paradigm. Judge Kunauer's analysis is sufficient to demonstrate there is a strong inference of scienter. Now, if the court really doubts or rejects everything I've said in my 17 minutes thus far, the prudent thing to do at that point is, of course, to return it to him, because there are things that have been unearthed since the motion to dismiss, which I think quite clearly reinforced the knowledge point that Killinger, Casey, Oppenheimer knew and participated. They reinforce and extend what the confidential witnesses already say. They reinforce and extend the natural implication of these people going to the marketplace, saying we've got it under control. SWAT team, we solved it. We're back on track. That's not the basis that the district court decided, though, right? I'm sorry, Your Honor. That wasn't the basis on which the district court decided. I think the district court decided it on two grounds. Core operations, which, depending on how you read, rewrite, or how you match it with the core operations plus, there's very powerful pluses here, just as strong as Intel Labs do. If you take core operations plus, then I think his conclusion that you can impute knowledge is right. That may sound a bit frightening in a floodgates of litigation sense, but this is a very unique fact-bound case. But to bridge the gap between the confidential witnesses saying there's a problem and did the officers know, he relies on this core operations inference, which, under read-write, we say that's not enough. Intel Labs is in contrary. So why is that? I keep going to the plus, Your Honor. This is not read-write. This is not naked core operations. You're throwing out additional facts, but that's not what the district court is saying, or you're pointing out additional items that the district court could have relied on. No, I think the district court's opinion, broadly read, puts a great deal of emphasis on the nature, the character, the frequency, the ownership of the actual statements made by the defendants. The district court does factor in the confidential witnesses. He points out that they're consistent. They reinforce each other. They're from people who seem to know. And remember, there is a second holding by Judge Kuhnhauer. It says, you know, if these people didn't know this but are speaking in the categorical, dogmatic way, the absolutist way they are speaking, if they didn't know this, that is deliberate recklessness for not finding out. So there really are two strings to the metaphorical bow used in Judge Kuhnhauer's opinion, either the imputation or the deliberate recklessness based on failure to inform. The president, the CFO, the person, Ms. Oppenheimer, put in charge of this problem. And she's saying with a straight face, I didn't know. Well, she should have known. She should have known. So it seems to me there is plenty, in his opinion, plenty in the statements, in the appendix, plenty in a completely detailed complaint to provide a basis for this court to affirm. Or if you believe there's a gap somewhere, to reverse and ask him, remand, I guess, and ask him, fill in those gaps. Do a tele-abs analysis. But I submit to you, he pretty much did a tele-abs analysis. We'll have to be the judge of that. And you are over time. I'm going to give your opponent another minute. So he'll equal it up. Thank you, Your Honor. Thank you. Judge Fisher, I appreciate the extra 30 seconds. Thank you very much. Don't use it up. Thank you. Judge, I will try to speak briefly. Judge Okuda, if you look at page 525 of the record, you will see Judge Kuhnauer's observation on certifying the issue to this court that the viability of the core operations inference is central to the outcome of this case. Judge Kuhnauer specifically rejected the confidential witnesses. He specifically rejected the allegations of insider trading. The only basis on which Judge Kuhnauer's finding sustained this complaint, in his own words, was the core operations. Judge Fisher, my friend on the other side, referenced the SWAT team. I would commend the court. Paragraph 79 of the complaint talks about the SWAT team in relation to pipeline hedging only. Ms. Oppenheimer's statement about interest rates and being positioned in paragraph 115 does not say what counsel represents to this court, it says. What she says is we are well positioned to weather any type of interest rate environment than we have been in the past. Two months later, Your Honors, the spread took a two deviation difference. That was not anticipated. That is not fraud. My light is on. I will say, if Your Honors answer the question as plaintiff's counsel requests that you do, you will be throwing out eight years of jurisprudence in this court and opening the floodgates to litigation. Thank you. You said that he rejected the confidential witnesses in total? Your Honor, what Judge Kuhnauer said is that there were some witnesses that he believed may have had information, but there wasn't a single confidential witness that he credited with specific allegations or information either that was based in Seattle or that could tie any of the three individuals to hedging problems or information systems problems. He specifically said because he cannot credit the confidential witnesses, he has to look to circumstantial evidence. Yes. I mean, that's often true. But confidential witnesses, they don't and haven't had discovery yet. That's sort of the burden that's been placed on the plaintiff's bar, hasn't it? Yes, Judge Fischer. I was just reacting to counsel's reference to the confidential witnesses. All right. Thank you very much. OK. Thank you both. We appreciate the argument, and the case is submitted.
judges: Fisher, Gould, Ikuta